# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**SANTOS ESCALERA-SALGADO**, *et al.*,

   Plaintiffs,

v.

**UNITED STATES OF AMERICA**,

   Defendant.

Civil No. 14-1352 (BJM)

## OPINION AND ORDER

Santos Escalera-Salgado ("Escalera") and Olga Pagan-Torres ("Pagan"), individually and on behalf of their minor children, brought this action against the United States of America (the "government") under the Federal Tort Claims Act ("FTCA" or "Act"), 28 U.S.C. §§ 2671–2680, alleging that federal agents unjustifiably shot Escalera while executing a search warrant at his residence. Docket No. 1. After Escalera's battery claim survived summary judgment due to a genuine dispute of material fact relating to the government's qualified immunity defense, this case proceeded to a two-day nonjury trial. Docket Nos. 48, 59, 60. The case is before me on consent of the parties. Docket No. 17.

## BACKGROUND

During the two-day trial, the court heard testimony from Escalera, Pagan, and David G. Townshend ("Townsend"), as well as from Homeland Security Investigations ("HSI") Agents Jose Ivan Calderon-Morales ("Calderon"), Ariel Perez-Nieves ("Perez"), Jose Fernandez ("Fernandez"), and Josue Menendez ("Menendez"). Docket Nos. 59, 60.

***Government's Account*[1]**

On October 29, 2011, Puerto Rico Police Department agents and HSI Agents Calderon, Perez, Fernandez, and Menendez—each trained to perform in the Special

---

[1] This account is based on the HSI agents' testimonies—the material portions of which I credited over Escalera's incredible narrative. Having credited the government's account, this narrative constitutes the court's findings of fact under Federal Rule of Civil Procedure 52(a). *See Rivera-Gomez* v. *de Castro*, 900 F.2d 1, 3 (1st Cir. 1990) (court may elect from conflicting facts).

Response Team (the "SRT")—met during the early morning hours to debrief a plan for the execution of various warrants at the Llorens Torres Public Housing Project, including the execution of a search warrant at Escalera's apartment (the "residence"). At this debriefing, the HSI agents were informed that Escalera was a drug trafficker fleeing from Puerto Rico's east coast due to threats on his life, that Escalera was a gang leader in the housing project, and that Escalera had a large amount of drugs, firearms, and money stashed at the residence. The search warrant for the residence was thus considered "high risk," and the SRT—which specializes in "special tactics" and responds to "violence" and "high-value subjects"—was assigned to "clear" the residence before the local police entered to conduct the search.

Before daylight broke, the HSI agents prepared to enter the residence equipped with firearms, helmets, bulletproof vests, clothing identifying them as police, and powerful flashlights that flood a dark room with light. Calderon, who served as the "breacher," knocked on the residence's front door and announced the presence of police several times. After receiving no response, Calderon forcibly breached the door and positioned himself behind Menendez, Perez, and Fernandez, and in front of a local police officer who also joined the operation. When the agents entered the residence, none of the lights inside were enabled and thus the agents relied on the illumination from their flashlights.

Menendez, who entered the residence first, saw two rooms: a closed bedroom to his left, and a bedroom with a partially opened door to his right.[2] Menendez homed in on the bedroom to his right and saw a silhouette emerge therefrom. In Spanish, Menendez repeatedly yelled, "Police," and ordered the individual to show his hands and not move. Ignoring these commands, and, as if acting upon "muscle memory," the individual lifted his shirt, reached for his waistband, and moved for cover behind a bedroom wall. Before

---

[2] Menendez's overzealous, defensive, and somewhat irreverent demeanor at trial invited some trepidation into the overall credibility of his testimony. *See United States* v. *Oquendo-Rivera*, 586 F.3d 63, 67 (1st Cir. 2009) ("the credibility of a story depends" on, among other things, the witness's demeanor and apparent "bias or interest"). Yet, Menendez's testimony was materially corroborated by the testimonies of the other HSI agents, and so I still elected to credit the government's version of the events leading up to the shooting in October 2011.

the individual was able to draw his hand from his waistband area, which contained no discernible "bulge," two back-to-back shots rang out—the first fired by Menendez, and the second by Fernandez. Each agent had aimed at the individual's center mass, and one of the two rounds lodged in Escalera's elbow. A subsequent search for a weapon came up empty.

*Plaintiffs' Version*

Escalera testified that, at around 5:00 a.m., law enforcement agents stormed into his residence and opened his bedroom's closed door. Before Escalera could stand from his bed, and while blinded by the bright lights piercing into his bedroom, Escalera heard two gun shots. Escalera then dropped from the bed, crawled on the ground toward the bedroom's light switch, and turned on the bedroom's lights. At this point, Escalera saw a law enforcement agent standing on his bed, realized that police officers had entered his residence, and realized that he had been shot. For her part, Pagan testified that she learned Escalera had been shot after she heard him complaining and moaning on the ground. Pagan also testified as to the emotional effects that this event has had on her and her children.

Townsend, an expert in forensic examination and firearms, reviewed the statements Calderon, Perez, Fernandez, and Menendez made during an internal investigation into the shooting. Townsend did not testify as to the angles from which the agents fired their weapons, or as to the location where Escalera was situated when he was shot. Rather, Townsend testified that, based on his review of the HSI agents' statements during the internal investigation and the totality of the circumstances, the shooting in this case was not justified.[3] Townsend so opined because, in his view, the HSI agents needed to see something that resembled a weapon before reasonably fearing for their lives and shooting.

## DISCUSSION

Escalera contends that the federal agents unlawfully battered him and that the federal government should be held to answer for his damages and the derivative claims of

---

[3] Expert testimony in excessive force cases "is neither required nor always appropriate." *Parker* v. *Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008). This testimony was of little help in this case.

Pagan and the couple's minor children. Since the parties' filing of the initial scheduling memorandum, the government has asserted the shield of the qualified immunity defense.

The Act "was designed primarily to remove the sovereign immunity of the United States from suits in tort." *Levin* v. *United States*, 568 U.S. ——, ——, 133 S. Ct. 1224, 1228, (2013) (internal quotation marks omitted). It does so by making the federal government "liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *United States* v. *Olson*, 546 U.S. 43, 46–47 (2005) ("the words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield" by considering analogies in which a private person could be found liable) (emphasis in original) (internal quotation marks omitted).

The "FTCA provides an exception to the United States' liability for certain torts, including assault, battery, and false arrest." *Tekle* v. *United States*, 511 F.3d 839, 851 (9th Cir. 2007). But when such torts are "committed by a federal law enforcement officer . . . liability is restored." *Id.*; *see also Millbrook* v. *United States*, —— U.S. —— 133 S. Ct. 1441, 1444 (2013) (FTCA waives sovereign immunity as to "acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest"). The relevant portion of the Act, which is known as the "law enforcement proviso," states as follows:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> . . . . .
>
> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.

*Millbrook*, 133 S. Ct. at 1444 (quoting 28 U.S.C. § 2680(h)).

"On its face, the law enforcement proviso applies where a claim both arises out of one of the proviso's six intentional torts, and is related to the 'acts or omissions' of an 'investigative or law enforcement officer.'" *Millbrook*, 133 S. Ct. at 1444–45. To determine whether the plaintiff can establish the government's liability under the FTCA, courts look to the "law of the place where the act or omission occurred." *See Calderon-Ortega* v. *United States*, 753 F.3d 250, 252 (1st Cir. 2014) (quoting 28 U.S.C. § 1346(b)(1)). Escalera was shot at his residence in Puerto Rico, and so Puerto Rico law supplies the "substantive rules of decision" that govern his claim. *See Calderon-Ortega*, 753 F.3d at 252. As explained in a prior opinion and order, Escalera's claim—as pled in the complaint—sounds in the intentional tort of battery and arises under Article 1802 of the Puerto Rico Civil Code ("Article 1802"). *See* P.R. Laws Ann. tit. 31, § 5141; Docket No. 48 at 6–8.

The Puerto Rico Supreme Court has previously relied on the common-law approach when analyzing claims sounding in battery. *See Montes* v. *Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963); *Rojas* v. *Maldonado*, 68 D.P.R. 818, 827 (1948) (jurisprudence of the United States referenced when resolving claim sounding in battery); Carlos J. Irizarry Yunqué, *Responsabilidad Civil Extracontractual*, § II.C.1 at 65–72 (3d ed. 1998). When "the Puerto Rico court has not diverged from common law principles," the Restatement (Second) of Torts supplies the "appropriate framework for analysis" of a tort claim arising under Puerto Rico law. *See Rodriguez* v. *United States*, 54 F.3d 41, 45 (1st Cir. 1995); *see also Importers Ctr., Inc.* v. *Newell Cos., Inc.*, 758 F.2d 17, 20 (1st Cir. 1985) (Restatement (Second) of Contracts considered in the absence of controlling Puerto Rico law); *United States* v. *Marshall*, 391 F.2d 880, 883 (1st Cir. 1968) (court followed Puerto Rico Supreme Court's pattern of reliance on common law to resolve the issue before the court).

Yet, even assuming that Escalera proved at trial a claim for common-law battery, he must also show that the HSI agents would not be shielded by qualified immunity before the federal government may be held to answer for his damages. This is because the First

Circuit has repeatedly "assumed that Puerto Rico tort law would not impose personal liability for" a tort encompassed by the law enforcement proviso "where the officers would be protected in *Bivens* claims by qualified immunity." *See* S*olis-Alarcon* v. *United States*, 662 F.3d 577, 583 (1st Cir. 2011); *see also Rodriguez*, 54 F.3d at 45 ("The legislative history accompanying the 1974 amendment makes clear that Congress intended to make the Government independently liable in damages for the *same type* of conduct that is alleged to have occurred in *Bivens (and for which that case imposes liability upon the individual Government officials involved* ).") (internal quotations omitted) (citing S. Rep. No. 588, 93d Cong., 2d Sess. 3 (1973), *reprinted in* 1974 U.S.C.C.A.N. 2789, 2791) (emphasis added); *see also Amos* v. *IRS*, 188 F.3d 512, *2 (9th Cir. 1999) ("the same considerations that supported the district court's finding of qualified immunity compel a judgment in favor of defendants on the FTCA claims as well").

Relying on *Rodriguez* and *Solis-Alarcon*, the First Circuit recently reiterated that imposing liability in such circumstances "might raise 'a significant question' of 'whether any local court could impose damage liability on federal officers where they would be exempt in a federal lawsuit and whether Congress under the FTCA would expect the federal government to shoulder such liability.'" *Diaz-Nieves* v. *United States*, 858 F.3d 678, 687 (1st Cir. 2017) (quoting *Solis-Alarcon*, 662 F.3d at 583–84). What is more, "[o]ne of the few" Puerto Rico Supreme Court cases dealing with civil liability of officers, *Valle Izquierdo* v. *Commonwealth*, effectively mirrors "the view that animates federal qualified immunity doctrine." *Solis-Alarcon*, 662 F.3d at 583 (citing *Harlow* v. *Fitzgerald*, 457 U.S. 800, 813–14 (1982)). Against this backdrop, Escalera has cited no authority throughout the proceedings in this case calling into question any of the foregoing First Circuit case law or otherwise attacking the government's *ability* to assert the qualified immunity defense.

Seizing upon its ability to assert the qualified immunity defense, the government properly asserted (and did not waive) its contention that it is entitled to qualified immunity under the circumstances presented in this case. Indeed, though the government did not

plead this defense in its answer, the government did so in the initial scheduling memorandum and at summary judgment. *See Brust* v. *City of Worcester*, 947 F. Supp. 2d 143, 145 (D. Mass. 2012) ("defendants may raise a claim of qualified immunity at three distinct stages of the litigation'—in a motion to dismiss at the pleading stage, at summary judgment, and as an affirmative defense at trial") (quoting *Guzman–Rivera* v. *Rivera–Cruz*, 98 F.3d 664, 667 (1st Cir. 1996)); *see also Acevedo Garcia* v. *Vera Monroig*, 30 F. Supp. 2d 141, 146 (D.P.R. 1998) (qualified immunity defense not waived where defendants failed to plead this defense in their answer but asserted the defense in the initial scheduling memorandum). What is more, after the court denied summary judgment due to a genuine dispute of material fact, the government re-asserted this defense in the pretrial order, elicited testimony pertinent to this issue at trial, and contended at trial that the HSI agents' use of force was not unreasonable. *See Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) ("Although defendants did not plead qualified immunity in their answer, they asserted the defense in other pretrial submissions, including the parties' joint pretrial order . . . .").

The qualified immunity doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818). This doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *MacDonald* v. *Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)); *see also Plumhoff* v. *Rickard*, ––– U.S. ––––, 134 S. Ct. 2012, 2023 (2014) (then-existing precedent "'must have placed the statutory or constitutional question . . . beyond debate'") (quoting *Ashcroft* v. *al–Kidd*, 563 U.S. 731, 741 (2011)). But the qualified immunity doctrine still has limits: it does "not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful." *MacDonald*, 745 F.3d at 11 (quoting *Haley* v. *City of Bos.*, 657 F.3d 39, 47 (1st Cir. 2011) (internal quotation marks omitted)).

When "a defendant invokes qualified immunity, the burden is on the plaintiff to show the inapplicability of the defense." *Rivera-Corraliza* v. *Morales*, 794 F.3d 208, 215 (1st Cir. 2015) (citing *Quintero de Quintero* v. *Aponte–Roque*, 974 F.2d 226, 228 (1st Cir. 1992)). To do so, the plaintiff must clear two hurdles: he or she must show that (1) "defendants violated a statutory or constitutional right," and that (2) "the right was clearly established at the time." *Morales*, 794 F.3d at 214 ("If plaintiffs stumble at either step," which can be analyzed in any order, the "due-process claims go kaput"). "The second prong, in turn, has two parts: (a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." *Diaz-Bigio* v. *Santini*, 652 F.3d 45, 50 (1st Cir. 2011).

To meet the requisite burden, "[t]he clearly-established step requires plaintiffs to identify controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct [was] illegal in the particular circumstances that he or she faced—then-existing precedent, in other words, must have placed the statutory or constitutional question . . . beyond debate." *Morales*, 794 F.3d at 214–15 (internal quotations omitted). *White* v. *Pauly*, 137 S. Ct. 548 (2017), aptly illustrates this principle within the context of an excessive force claim arising under the Fourth Amendment—which is essentially the type of claim Escalera could have brought against the HSI agents under *Bivens*. In *White*, a panel majority of the Tenth Circuit denied qualified immunity to a police officer who was involved in a fatal shooting. *Id.* at 550. Even after crediting the panel majority's account of the events, the Supreme Court ultimately reversed the denial of qualified immunity to this officer, reasoning that the Tenth Circuit's panel majority "misunderstood the 'clearly established' analysis" by denying the defense while failing "to identify a case where an officer acting under similar circumstances as" the officer-defendant "was held to have violated the Fourth Amendment." *Id.* at 552.

A court is "free to jump directly to—and decide the case exclusively on—the clearly-established step in certain situations." *Morales*, 794 F.3d at 215. When conducting this inquiry,

the First Circuit has declined "to adopt 'a hard-and-fast rule' that out-of-circuit precedent is either determinative of or irrelevant to whether a law is clearly established." *Barton* v. *Clancy*, 632 F.3d 9, 22 (1st Cir. 2011) (quoting *El Dia, Inc.* v. *Rossello*, 165 F.3d 106, 110 n.3 (1st Cir. 1999)). Rather, "whether precedent 'clearly establishes' a law may depend in part upon 'the location and level of the precedent, its date, its persuasive force, and its level of factual similarity to the facts before" the court. *Id.* (citing *El Dia*, 165 F.3d at 110 n.3).

In this case, neither the parties' briefing at summary judgment nor their arguments at trial referenced a case directly controlling the one before the court. This is particularly troublesome for Escalera's ability to overcome the government's qualified immunity defense, as "[e]xcessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity." *See Ontiveros* v. *City of Rosenberg*, 564 F.3d 379, 383 (5th Cir. 2009) (citing *Brosseau* v. *Haugen*, 543 U.S. 194, 201 (2004)). Additionally, because the burden of identifying the pertinent case law rested with Escalera, he waived his opportunity to overcome the government's entitlement to qualified immunity under the circumstances here. *See Morales*, 794 F.3d at 214–15; *see also Kearns* v. *Comba*, 252 F. App'x 141 (9th Cir. 2007) ("By failing to respond to Defendants' qualified immunity argument below," the plaintiff "waived the opportunity to oppose it for the first time on appeal").

Even if Escalera had not waived his opportunity to overcome the government's entitlement to qualified immunity, independent research has revealed neither directly controlling case law nor a robust consensus of out-of-circuit precedent that would have notified the HSI agents on October 29, 2011, that their conduct violated clearly established law. An excessive force claim "should be—and is—brought under the Fourth Amendment." *Estate of Bennett* v. *Wainwright*, 548 F.3d 155, 163 (1st Cir. 2008) (citing *Graham* v. *Connor*, 490 U.S. 386, 395 (1989)). "The test for whether the use of deadly force is excessive is whether an objectively reasonable officer would believe that the suspect posed a 'threat of serious physical harm either to the officer or others.'" *Young* v. *City of Providence ex rel. Napolitano*, 404 F.3d 4, 23 (1st Cir. 2005) (quoting *Tennessee* v. *Garner*, 471 U.S. 1, 11 (1985)). As the government

underscored at trial, this evaluation "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Yet, the Supreme Court has held "that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case'"—because these cases "lay out excessive-force principles at only a general level." *See White*, 137 S. Ct. at 552. Indeed, the Supreme Court has relayed that excessive-force cases are highly context-dependent, *see Brosseau*, 543 U.S. at 20, and cases like *Ontiveros*, 564 F.3d at 385, "serve to inject a substantial measure of doubt as to whether the Fourth Amendment" clearly barred the HSI agents' use of deadly force in October 2011. *See MacDonald*, 745 F.3d at 14–15. *Ontiveros* noted that the Fifth Circuit "has upheld the use of deadly force where a suspect moved out of the officer's line of sight and could have reasonably been interpreted as reaching for a weapon." *See Ontiveros*, 564 F.3d at 385 (citing *Reese* v. *Anderson*, 926 F.2d 494, 501 (5th Cir. 1991) (police did not use excessive force where suspect repeatedly refused to keep hands raised and appeared to be reaching for an object, despite the "fact that [suspect] was actually unarmed"); *Young* v. *City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985) (use of deadly force permitted when suspect refused instructions to exit the vehicle and reached down to the floorboard)); *see also Carnaby* v. *City of Houston,* 636 F.3d 183, 188 (5th Cir. 2011) (circuit court case decided around the time when the HSI agents shot Escalera referenced cases like *Ontiveros* to provide governing law).

What is more, *Ontiveros* itself involved circumstances quite similar to those presented in this case. *See Ontiveros*, 564 F.3d at 380–82. In *Ontiveros*, the police shot Modesto Ontiveros ("Ontiveros") while executing a warrant for his arrest. *Id.* That warrant was classified as "high risk," and so a "SWAT team" was authorized to serve the warrant. *Id.* The officers (who wore clothing identifying them as such) entered Ontiveros's residence at night. Upon making entry, the officers yelled "Police" in English and Spanish. *Id.* And, with the aid of their tactical flashlights, the officers saw one individual retreat into a hallway and the silhouette of another inside a bedroom. *Id.* After the individual that retreated into the hallway was detained, the officers breached the bedroom door. *Id.* When that door opened, one of the officers "illuminated Ontiveros with the tactical light on his pistol and saw him a few feet away

holding an object over his head." *Id.* When Ontiveros moved behind the door, the officer yelled, "Let me see your hands," several times in English and continued to view Ontiveros only by glancing around the door with his tactical light. *Id.* The officer then "saw Ontiveros reaching into a boot at chest level for what" the officer "believed could be a weapon." *Id.* At this point––and before seeing a weapon—the officer fired two shots. *Id.* at 381, 384 n.2. A "subsequent search of the bedroom revealed no weapons." *Id.* at 381. Under these circumstances, the Fifth Circuit held that the officer did not violate Ontiveros's constitutional rights. *Id.* at 385.

To be sure, Escalera could have potentially referenced other out-of-circuit precedent that arguably could have buttressed his position. See *A. K. H. ex. rel. Landeros* v. *City of Tustin*, 837 F.3d 1005, 1012 (9th Cir. 2016) (officer not entitled to qualified immunity where he "neither warned Herrera that he was going to shoot" the suspect, "nor waited to see if there was anything in" the suspect's "hand"); *Walker* v. *City of Orem*, 451 F.3d 1139 (10th Cir. 2006) (qualified immunity denied where officers shot a suicidal suspect who was holding a knife to his left wrist; the first officer opened fire because, he contended, he reasonably believed the suspect was holding a gun; the second officer believed the suspect was swinging toward him in a "classic pistol shooting stance"). Yet, Escalera's reliance on cases like *Walker*––which is less analogous to the circumstances here than is *Ontiveros*—would ultimately not defeat the government's entitlement to qualified immunity because "courts penalize officers for violating 'bright lines,' not for making 'bad guesses in gray areas.'" *See Morales*, 794 F.3d at 215 (quoting *Maciariello* v. *Sumner,* 973 F.2d 295, 298 (4th Cir. 1992)); *see also MacDonald*, 745 F.3d at 14–15 ("Even if the cases that run contrary to the plaintiff's position were wrongly decided—a matter on which" the court need not take a view—"they serve to inject a substantial measure of doubt" into the clarity of the law at issue).

As a matter of law, the HSI agents would have been entitled to qualified immunity had Escalera brought a *Bivens* action against them—as they did not violate law clearly established in October 2011. Because the First Circuit has assumed that "Puerto Rico tort law would not impose personal liability for" a tort encompassed by the law enforcement

proviso "where the officers would be protected in *Bivens* claims by qualified immunity," the federal government is also shielded from liability. *See, e.g.*, *Diaz-Nieves*, 858 F.3d at 687. And the same is true with respect to the derivative Article 1802 claims of Pagan and the couple's minor children. That is because these claims are "wholly derivative and depend[] on the viability of the underlying claim of" Escalera. *See id.* at 689. Thus, because qualified immunity shields the federal government from any liability in this FTCA action, judgment shall be entered for the United States and against plaintiffs.

## CONCLUSION

For the foregoing reasons, qualified immunity shields the government from liability in this case, and so judgment will be entered for the United States of America and against Santos Escalera-Salgado, Olga Pagan-Torres, and the couple's minor children.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 5th day of July 2017.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge